Case 4:19-cr-00034 Document 14 Filed 03/08/19 Page 1 of 9 PageID 49

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAR - 8 2019

CLERK, U.S. DISTRICT COURT

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.   No. 4:19-CR-034-A

HARRIS BROOKS (01)

## FACTUAL RESUME

**INFORMATION**

    Count One: Conspiracy to Commit Healthcare Fraud, 18 U.S.C. § 371 (18 U.S.C. § 1347)

**PLEA**

    Guilty plea to Count One

**MAXIMUM PENALTY**

    Upon conviction of Count One, the maximum penalty is as follows:

- Term of imprisonment for not more than five years;
- A fine up to the amount of $250,000, or twice the pecuniary gain or twice the pecuniary loss;
- A mandatory special assessment of $100;
- A term of supervised release of not more than three years, which may be mandatory under the law and will follow any term of imprisonment. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release and multiple revocations of supervised release may result in a term of imprisonment that exceeds the maximum term of supervised release;
- Restitution to victims or to the community, which is mandatory under the law, and which Defendant agrees may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone; and
- costs of incarceration and supervision.



## ELEMENTS OF THE OFFENSE

To find the defendant guilty of the charged offense of conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 371 (18 U.S.C. § 1347), the government must prove the following elements beyond a reasonable doubt:

First: That the defendant and at least one other person made an agreement to commit the crime of healthcare fraud in violation of 18 U.S.C. § 1347, as charged in the Information;

Second: That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

Third: That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the Information, in order to accomplish some object or purpose of the conspiracy.

The elements of 18 U.S.C. § 1347 are as follows:

First: That the defendant knowingly and willfully executed a scheme or artifice to defraud a healthcare benefit program, Blue Cross and Blue Shield of Texas, CIGNA HealthCare of Texas, Inc., and United Healthcare, by means of false or fraudulent pretenses in connection with the delivery of or payment for health care benefits, items, or services;

Second: That the defendant acted with a specific intent to defraud a health care benefit program;

Third: That the false or fraudulent pretenses that the defendant used were material; and

Fourth: That the operation of the healthcare benefit program affected interstate commerce.

## STIPULATION OF FACTS

1. As set forth more fully below, Defendant **Harris Brooks (Brooks)**, together with others known and unknown, conspired to defraud, and did defraud, Blue Cross and Blue Shield of Texas (BCBSTX), CIGNA HealthCare of Texas, Inc. (CIGNA) United Healthcare (UHC), and other health insurance providers by submitting, and causing to be submitted, claims for laboratory services as though Palo Pinto General Hospital (PPGH) performed the laboratory services. In reality, the laboratory services were performed by other laboratories, not PPGH, for individuals who were not patients at the hospital. Both patients and insurance providers were charged for laboratory services not rendered by the rural hospital.

### The Defendant and Others Relevant to the Scheme

2. PPGH, located in Mineral Wells, Texas, is a rural hospital owned and operated by the Palo Pinto County Hospital District, organized under the laws of the State of Texas, and its purpose is to serve as a general acute care hospital for the county. Defendant **Brooks**, a resident of Mineral Wells, Texas, was the Chief Executive Officer (CEO) of PPGH.

3. Two unindicted co-conspirators ("CC1" and "CC2"), through their company ("LLC1"), marketed the fraudulent pass-through billing scheme for laboratory services to **Brooks**. CC1 and CC2 along with **Brooks** oversaw the implementation of the billing scheme at PPGH.

4. Another two unindicted co-conspirators ("CC3" and "CC4") were also involved in the implementation of the pass-through billing scheme at PPGH. CC3 and CC4, through their company ("LLC2"), would solicit healthcare providers, not PPGH, throughout Texas and elsewhere to send their laboratory samples to various laboratories throughout the United States

**Factual Resume (Brooks) - Page 3**

for testing. In reality, the samples were sent to the non-PPGH laboratories for testing and then billed as though PPGH performed the tests at PPGH.

5.  A company ("Billing Company") performed the billing for fraudulent claims on behalf of PPGH. PPGH, however, had an in-house billing department that processed its legitimate claims on behalf of PPGH.

### The Healthcare Benefit Programs

6.  BCBSTX was a private for-profit health insurance company in Texas that provided healthcare benefits to individuals enrolled for coverage under individual and employer-sponsored group plans. CIGNA and UHC were also healthcare insurance companies that provided healthcare benefits to individuals enrolled for coverage under individual and group plans. Individuals who received healthcare benefits were referred to as "Subscribers" or "Members."

7.  BCBSTX, CIGNA, and UHC are "health care benefit programs" as defined by 18 U.S.C. § 24(b), and used in 18 U.S.C. § 1347, that affected commerce.

### Coverage of Healthcare Services

8.  BCBSTX, CIGNA, UHC, and other insurance companies contracted with physicians and other healthcare providers, including hospital-based providers such as PPGH, for each provider to become an approved "in-network" provider. As part of the application process, each provider agreed to comply with each health insurance companies' regulations, medical policies, and provider manual guidelines. The amount the health insurance company would reimburse a provider for healthcare services, including laboratory tests, varied based on the contractual agreements between the provider and the health insurance company. Providers also

had responsibility for collection of any applicable copayments, coinsurance, or deductible amounts.

9. BCBSTX, CIGNA, UHC, and other health insurance companies also contracted with Subscribers under individual and group policies to cover healthcare services for the individual. Each individual and group insurance plan detailed the benefits available to Subscribers, ranging from inpatient and outpatient services for hospital-related care, which included laboratory services. Each insurance plan specified, among other things, the amount of the Subscriber's copayment, coinsurance, and deductible for covered items and services.

10. Specifically, BCBSTX, CIGNA, and UHC each offered health benefit plans to Subscribers that covered expenses for medically necessary laboratory services, which varied based on the medical needs of each individual patient. PPGH's contracts with BCBSTX, CIGNA, and UHC set the rates at which the health insurance companies would reimburse PPGH for services PPGH provided. Pursuant to these contracts, PPGH was considered an "in-network" provider, which enabled PPGH to be paid for its services at a higher rate than an "out-of-network" provider.

11. To obtain payment from the health insurance companies, PPGH, or its designee, was required to submit claims, either electronically or on paper, to BCBSTX, CIGNA, and UHC that included, among other things, the following: PPGH's National Provider Identifier (NPI) or unique provider identification number; the patient's name; the patient's diagnosis described by a standardized code; a description of the service(s) rendered to the patient using standardized codes; the date and location the services were provided; and the amount claimed for payment.

12. Starting in or around September 1, 2017, and continuing through on or about June 2018, the Billing Company, on PPGH's behalf, billed various insurance plans held by BCBSTX, Cigna, and UHC for laboratory tests for allergy and genetic-type testing. These type of tests contrasted significantly with the types of laboratory tests PPGH previously ordered and processed in its laboratory. The reason for the change was PPGH began the submission of claims for laboratory services for allergy and genetic tests for non-PPGH patients. Moreover, PPGH's laboratory did not perform the tests, and the physicians ordering the tests had no affiliation with PPGH.

13. Beginning on or about November 7, 2016, and continuing through on or about June 2018, in the Northern District of Texas and elsewhere, defendant **Harris Brooks**, along with others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, to violate 18 U.S.C. § 1347, that is, to devise and to execute a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), that is BCBSTX, CIGNA, UHC, and other health insurance providers, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, BCBSTX, CIGNA, UHC, and other health insurance providers, in connection with the delivery of, and payment for, healthcare benefits, items, and services, namely laboratory services.

## Purpose of the Conspiracy

14. **Brooks**, as PPGH CEO, along with his co-conspirators, engaged in a scheme to defraud and conceal PPGH's role as a pass-through billing entity for out-of-network providers in

order to receive significantly higher reimbursements from insurance companies. The higher rates resulted from PPGH's status as an "in-network" provider for BCBSTX, CIGNA, UHC, and the other health insurance providers.

### The Scheme to Defraud

15. On or about November 7, 2016, **Brooks**, as PPGH CEO, signed a Laboratory Services Agreement (LSA) with CC1, as President of LLC1. The LSA outlined the terms of the agreement, whereby LLC1 would contract and manage genetic, allergy, toxicology, blood and other hospital laboratory services in Texas and the surrounding region for various physicians and other medical providers. PPGH agreed to pay LLC1 60% of the monthly "Net Collections" received by PPGH from insurance companies. LLC1 would pay the proceeds it received from the scheme to CC1 and CC2, and, through LLC2, to CC3 and CC4. LLC1 and LLC2 outsourced the billing of laboratory services PPGH purportedly provided through the Billing Company.

16. CC3, CC4, and others, doing business as LLC2, marketed laboratory services to various physicians and medical clinics throughout Texas. LLC2 coordinated the laboratory services with those providers who agreed to do business with LLC2 and then directed the volume and billing of those laboratory services by the Billing Company on behalf of PPGH. LLC2 also addressed any patient complaints regarding the fraudulent claims the Billing Company submitted on behalf of PPGH.

17. Using PPGH's national identification number (NPI) XXXXXX0602, the Billing Company submitted claims to insurance companies, including BCBSTX, CIGNA, and UHC, for laboratory services for allergy and genetic testing purportedly performed at PPGH. In reality,

PPGH did not have the equipment on-site to perform the tests for which it submitted claims to the insurance companies. Moreover, the patients were non-PPGH patients and did not know about the pass-through charges using PPGH's insurance contracts.

18. It was further part of the conspiracy that the samples for testing would be taken from the non-PPGH patients and were then sent to other laboratories, not PPGH, for testing. During the course of the conspiracy, the scheme changed and the spas and clinics who took the samples would mail the sample for testing to PPGH. PPGH would then re-package and re-label the sample and send it to the other laboratories for testing. This was known as the "accessioning" process.

### Overt Acts in Furtherance of the Conspiracy

19. In furtherance of the conspiracy and to effect its object, the following overt acts, among others, were committed in the Northern District of Texas and elsewhere, by Defendant **Brooks**, who caused the Billing Company to submit the following fraudulent claims using PPGH's NPI number:

| First Name | Last Name | Date of Service | Insurer | Claim Number | Amount Billed | Amount Paid |
|---|---|---|---|---|---|---|
| A. | B. | 10/03/2017 | CIGNA | 9681730519132 9681730519131 | $13,588.08 | $7,659.92 |
| D. | F. | 01/23/2018 | CIGNA | 4651803807456 4651803807455 | $13,588.08 | $7,659.92 |
| K. | G. | 02/01/2018 | BCBSTX | 0000201805250 K29730X | $13,591.71 | $3,481.58 |
| J. | P. | 11/03/2017 | BCBSTX | 0000201734050 K01910X | $13,588.08 | $2,641.94 |
| I. | R. | 09/11/2017 | UHC | 678959170301 | $12,289.20 | $2,054.99 |
| M. | V. | 02/13/2018 | UHC | 700995989801 | $12,291.84 | $2,774.45 |

Each claim listed above is a separate overt act. None of the patients identified in the table above was a patient at PPGH, and none of the laboratory services billed in the table above was performed at PPGH.

### Effect on Health Insurance Providers

20. Beginning in or about September 2017 and continuing through June 2018, the Billing Company, on PPGH's behalf, submitted claims to BCBSTX, CIGNA, UHC, and other health insurance providers for laboratory services totaling more than $55 million, the vast majority of which were fraudulent. As a result of these claims, the health insurance providers paid PPGH more than $9 million.

21. Had the health insurance providers been aware that PPGH was submitting claims for laboratory services it had not performed, they would have denied the claims.

SIGNED and AGREED to on this the 5TH day of February, 2019.

_____
HARRIS BROOKS
Defendant

_____
JAY DEWALD
Attorney for Defendant